ROBERT S. BREWER, JR.
United States Attorney
DAVID J. RAWLS
Assistant U.S. Attorney
District of Columbia Bar No. 974620
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-7966
Email: david.rawls@usdoj.gov

Attorneys for Plaintiff
United States of America

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

$49,812.40 IN U.S. CURRENCY
SEIZED FROM WELLS FARGO
BANK ACCOUNT NUMBER XX3071;

$1,016,738.02 IN U.S. CURRENCY
SEIZED FROM WELLS FARGO
BANK ACCOUNT NUMBER XX1430;

$15,448.64 IN U.S. CURRENCY
SEIZED FROM WELLS FARGO
BANK ACCOUNT NUMBER XX0706;

$559.15 IN U.S. CURRENCY SEIZED
FROM WELLS FARGO BANK
ACCOUNT NUMBER XX0557;

$142,580.46 IN U.S. CURRENCY
SEIZED FROM WELLS FARGO
BANK ACCOUNT NUMBER XX9816;

$60,961.48 IN U.S. CURRENCY
SEIZED FROM WELLS FARGO
BANK ACCOUNT NUMBER XX6408;

$2,058,060.72 IN U.S. CURRENCY
SEIZED FROM WELLS FARGO
BANK ACCOUNT NUMBER XX7253;

$1,022.12 IN U.S. CURRENCY
SEIZED FROM WELLS FARGO
BANK ACCOUNT NUMBER XX8049;

Case No.   '21CV91   TWR AGS

**COMPLAINT FOR FORFEITURE**

$4,983.50 IN U.S. CURRENCY SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER XX5609;

$4,388,112.64 IN U.S. CURRENCY SEIZED FROM FIDELITY INVESTMENTS ACCOUNT NUMBER XX0472;

$2,134,352.70 IN U.S. CURRENCY SEIZED FROM FIDELITY INVESTMENTS ACCOUNT NUMBER XX0473;

$3,896,247.90 IN U.S. CURRENCY SEIZED FROM FIDELITY INVESTMENTS ACCOUNT NUMBER XX0474;

$544,162.17 IN U.S. CURRENCY SEIZED FROM FIDELITY INVESTMENTS ACCOUNT NUMBER XX0475;

$837,395.44 IN U.S. CURRENCY SEIZED FROM FIDELITY INVESTMENTS ACCOUNT NUMBER XX0476;

$218,544.33 IN U.S. CURRENCY SEIZED FROM FIDELITY INVESTMENTS ACCOUNT NUMBER XX0477;

$292,635.83 IN U.S. CURRENCY SEIZED FROM FIDELITY INVESTMENTS ACCOUNT NUMBER XX4433;

$950.20 IN U.S. CURRENCY SEIZED FROM FIDELITY INVESTMENTS ACCOUNT NUMBER XX2582;

2018 PORSCHE PANAMERA, CALIFORNIA LICENSE PLATE NUMBER 8GTX359, VEHICLE IDENTIFICATION NUMBER WP0AB2A76JL1355537;

2019 FORD LARIAT 4X2 F-150, FLORIDA LICENSE PLATE NUMBER LEJQ98, VEHICLE IDENTIFICATION NUMBER 1FTEW1C51KFB110044;

2019 AUDI Q8 PREMIUM, FLORIDA
LICENSE PLATE NUMBER LCII94,
VEHICLE IDENTIFICATION
NUMBER WA1AVAF10KD010335;

REAL PROPERTY LOCATED AT
2936 MIDSUMMER DR,
WINDERMERE, FL 34786;

Defendants.

By way of complaint against the Defendants, Plaintiff, UNITED STATES OF AMERICA alleges:

## I.   NATURE OF THE ACTION

1.   This is a civil action in *rem* brought against the Defendants to enforce the provisions of Title 18, United States Code, Section 981(a)(1)(C), because the Defendants are subject to forfeiture as any property, real or personal, which constitutes or are derived, from proceeds traceable to violations of Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud); and Title 18, United States Code, Section 1347 (Health Care Fraud); and Title 42, United States Code, Section 1320-7b(b)(2)(A) (Anti-Kickback Statute); and Title 18, United States Code, Section 1956 (Laundering Monetary Instruments); and Title 18, United States Code, Section 1957 (Transacting in Criminal Proceeds); or any violation of any offense constituting a "specified unlawful activity" as defined in Title 18, United States Code, Section 1956(c)(7), or a conspiracy to commit such offense.

2.   The Defendants are also subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(A) as any property, real or personal, involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1956, or Title 18, United States Code, Section 1957.

## II.   JURISDICTION AND VENUE

3.   This Court has original jurisdiction of this civil action under Title 28, United States Code, Section 1345 because it has been commenced by the United States, and

1  under Title 28, United States Code, Section 1355(a), because it is an action for the recovery
2  and enforcement of a forfeiture under an Act of Congress.

3      4.    Venue is proper pursuant to Title 28, United States Code, Section 1355(b)
4  because acts and omissions giving rise to this forfeiture action occurred in the Southern
5  District of California, and under Title 28, United States Code, Section 1395 because the
6  property was found and is located in this district.

7  **III.**   **PARTIES**

8      5.    Plaintiff is the United States of America.

9      6.    The following Defendants are in the custody of the United States:

10     a.    Defendant $49,812.40 in U.S. currency was seized from Wells Fargo
11 Bank account number XX3071. The account was registered to PRV Medical Supply, Inc.
12 The signers on the account were Melinda E. Green and Charles Ronald Green Jr.

13     b.    Defendant $1,016,738.02 in U.S. currency from Wells Fargo Bank
14 account number XX1430. The account was registered to EZ Life Medical Supply, Inc. The
15 signer on the account was Charles Ronald Green Jr.

16     c.    Defendant $15,448.64 in U.S. currency from Wells Fargo Bank account
17 number XX0706. The account was registered to NHS Pharma, Inc. The signers on the
18 account were Melinda E. Green and Charles Ronald Green Jr.

19     d.    Defendant $559.15 in U.S. currency from Wells Fargo Bank account
20 number XX0557. The account was registered to NHS Pharma Sales, Inc. The signers on the
21 account were Melinda E. Green and Charles Green.

22     e.    Defendant $142,580.46 in U.S. currency from Wells Fargo Bank
23 account number XX9816. The account was registered to Zee & Associates LLC. The signer
24 on the account was Charles Green.

25     f.    Defendant $60,961.48 in U.S. currency from Wells Fargo Bank account
26 number XX6408. The account was registered to Choice Medical Products, Inc. The signer
27 on the account was Charles R. Green Jr.

28

g.      Defendant $2,058,060.72 in U.S. currency from Wells Fargo Bank account number XX7253. The account was registered to ERM Management Services, Inc. The signers on the account were Charles Ronald Green Jr. and David Palmer Tenney.

h.      Defendant $1,022.12 in U.S. currency from Wells Fargo Bank account number XX8049. The account was registered to Focus DME Billing, Inc. The signers on the account were Melinda E. Green and Charles Ronald Green Jr.

i.      Defendant $4,983.50 in U.S. currency from Bank of America account number XX5609. The account was registered to Zee Associates, LLC, DBA Bio Scientific Medical Supply. The signer on the account was Charles Ronald Green.

j.      Defendant $4,388,112.64 in U.S. currency from Fidelity Investments account number XX0472. The account was registered to the Greenshaven Trust. The signer on the account was David P. Tenney.

k.      Defendant $2,134,352.70 in U.S. currency from Fidelity Investments account number XX0473. The account was registered to the Greenshaven Trust. The signer on the account was David P. Tenney.

l.      Defendant $3,896,247.90 in U.S. currency from Fidelity Investments account number XX0474. The account was registered to the Greenshaven Trust. The signer on the account was David P. Tenney.

m.      Defendant $544,162.17 in U.S. currency from Fidelity Investments account number XX0475. The account was registered to the Greenshaven Trust. The signer on the account was David P. Tenney.

n.      Defendant $837,395.44 in U.S. currency from Fidelity Investments account number XX0476. The account was registered to the Greenshaven Trust. The signer on the account was David P. Tenney.

o.      Defendant $218,544.33 in U.S. currency from Fidelity Investments account number XX0477. The account was registered to the Greenshaven Trust. The signer on the account was David P. Tenney.

p.      Defendant $292,635.83 in U.S. currency from Fidelity Investments account number XX4433. The account was registered to the Greenshaven Trust. The signer on the account was David P. Tenney.

q.      Defendant $950.20 in U.S. currency from Fidelity Investments account number XX2582. The account was registered to the Greenshaven Trust. The signer on the account was David P. Tenney.

r.      Defendant 2018 Porsche Panamera, California license plate number 8GTX359, vehicle identification number WP0AB2A76JL1355537. The vehicle was registered to Charles Green

s.      Defendant 2019 Ford Lariat 4X2 F-150, Florida license plate number LEJQ98, vehicle identification number 1FTEW1C51KFB110044. The vehicle was registered to Charles Green.

t.      Defendant 2019 Audi Q8 Premium, Florida license plate number LCII94, vehicle identification number WA1AVAF10KD010335. The vehicle was registered to Charles Green.

7.      Defendant Real Property located at 2936 Midsummer Drive, Windermere, Florida 35786. The Real Property is owned by Melinda Elizabeth Green and Charles Ronald Green. The Real Property is more fully described in paragraph 248 below.

**GREENS CHARGED BY CRIMINAL INDICTMENT ON TRICARE FRAUD**

8.      On June 10, 2020, Charles Ronald Green, Jr. and Melinda Elizabeth Green were charged by a grand jury in the Southern District of California with a seven-count indictment for conspiracy, wire fraud, payment of kickbacks in connection with a federal health care program, and criminal forfeiture in criminal case number 20-cr-01566-DMS.

9.      As alleged in the indictment, Charles Ronald Green, Jr. and Melinda Elizabeth Green (the GREENS), through their related entities, including NHS Pharma, Inc. and NHS Pharma Sales Inc., served as the go-between for kickback payments from pharmacies to doctors and clinics, in exchange for doctors signing prescriptions for compound

pharmaceutical medications supplied by the pharmacies. As a result, TRICARE received and paid out on fraudulent claims for the pharmaceutical products.

10.    As further alleged in the indictment, the GREENS, and not any doctor or pharmacist, "through NHS, coordinated and directed the development and dissemination of pre-printed prescriptions for expensive compounded medications, for which TRICARE reimbursed up to tens of thousands of dollars per prescription or more, that were designed to maximize reimbursement from TRICARE and to increase the amount of kickbacks paid by [the pharmacy] to them and to their co-conspirators, and not with regard to any actual medical need." *U.S. v. Green, et al.*, 20-cr-001566-DMS, Indictment, ¶ 27(c).

## THE MEDICARE PROGRAM

11.    Medicare is a federal health care program that provides benefits to persons who are sixty-five years of age or older, or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare are referred to as Medicare "beneficiaries." Medicare is a health care benefit program as defined by Title 18, United States Code, Section 24(b).

12.    Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B covers medically necessary physician office services, including the ordering of durable medical equipment (DME) such as arm, leg, back, and neck braces.

13.    CMS contracts with various entities to carry out aspects of its administration of Medicare. CMS used Medicare Administrative Contractors (MACs) to receive and process claims, based on region and type of claim. The MACs for DME claims are Noridian Healthcare Solutions, LLC and CGS Administrators, LLC.

14.    Funds from CMS, Noridian Healthcare Solutions, LLC, and CGS Administrators, LLC are collectively referred to in this Complaint as funds from Medicare.

**DURABLE MEDICAL EQUIPMENT**

15.   To receive reimbursement from Medicare for off-the-shelf (i.e., not custom) orthotics, a DME supplier was required to submit a claim for Medicare reimbursement, either electronically or in writing, through standard forms, either the Form CMS-1500 or UB-92. Both of these claim forms require important information, including: (a) the beneficiary's name and identification number; (b) the name and identification number of the referring/ordering provider who ordered the orthotics; (c) the health care benefit item that was provided or supplied to the beneficiary; (d) the billing codes for the specified item; and (e) the date upon which the item was provided or supplied to the beneficiary.

16.   According to the Local Coverage Determination (LCD) in place nationally for services performed on or after October 1, 2015, knee braces required an examination of the patient. The LCD states that knee braces are medically necessary only where knee instability is documented by an in-person examination of the beneficiary and by an objective description of joint laxity. Claims are expressly not reasonable and not necessary if based only on a patient's description of knee pain or instability. Back braces are covered only when they were ordered: (1) to reduce pain by restricting mobility of the trunk; (2) to facilitate healing following an injury to the spine or related soft tissues; (3) to facilitate healing following a surgical procedure on the spine or related soft tissue; or (4) to otherwise support weak spinal muscles and/or a deformed spine. Shoulder, wrist, and ankle braces must be medically necessary for diagnosis of, or to treat, an injury or illness.

**TELEMEDICINE**

17.   According to the Medicare Claims Processing Manual, Chapter 12, Section 190, coverage and payment for Medicare telehealth, requires that: (a) the beneficiary was located in a rural or health professional shortage area; (b) the services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth consultation.

6

**FEDERAL ANTIKICKBACK STATUTE**

18.   The Federal Anti-Kickback Statute provides that it is a felony for a person or entity to knowingly and willfully offer or pay any remuneration to induce a person to refer an individual for the furnishing or arranging for the furnishing of any item for which payment may be made under a Federal health care program. 42 U.S.C. § 1320-7b(b)(2)(A),(B).

**OVERVIEW OF THE MEDICARE FRAUD SCHEME**

19.   From on or about June 1, 2018 through at least July 17, 2020, Melinda Elizabeth Green and Charles Ronald Green Jr. (the GREENS), and their various entities, violated the anti-kickback and health care fraud statutes, along with the money laundering statutes. As a result, the GREENS received and obtained millions of dollars in criminal proceeds.

20.   The GREENS engaged in a scheme to defraud Medicare as follows: (1) the GREENS owned or controlled companies, including <u>E.Z. LIFE Medical Supply, Inc. (EZ LIFE)</u>, <u>PRV Medical Supply, Inc. (PRV)</u>, <u>ZEE & Associates, Inc. (ZEE)</u>, and <u>Choice Medical Products, Inc. (CHOICE)</u>, that supplied DME braces to patients; and (2) in order to obtain customers for their DME companies, the GREENS purchased "completed doctors' orders" from various marketers, and submitted bills to Medicare and other insurers for the DME, thereby paying kickbacks for patients in violation of the anti-Kickback statute; and (3) to disguise their fraudulent kickback scheme, the GREENS and their co-conspirators entered into sham "marketing" and other contracts that concealed the fact that the GREENS paid a per-product fee to purchase the DME patients.

21.   In addition to paying kickbacks to obtain patients for their DME companies, EZ LIFE, PRV, ZEE, and CHOICE, the GREENS also bought and resold, or brokered, "completed doctors' orders" to other DME companies, through <u>NHS PHARMA SALES, Inc. (NHS SALES)</u>.

22.   The GREENS also provided billing services to DME companies through FOCUS in exchange for a percentage of the Medicare reimbursements as payment. The

billing services included access to an online portal where DME companies were able to track the status of their billing and access the "completed doctor's orders".

23.     A "completed doctor's order" (also referred to among the co-conspirators as a "D.O." or "D.O.'s") consisted of a signed doctor's prescription for DME braces, along with chart notes, and a letter of medical necessity. A signed doctor's prescription, chart notes, and a letter of medical necessity were all of the required documents that a DME company needed to bill Medicare for supplying DME braces to that Medicare beneficiary.

24.     The Medicare fraud scheme violates federal law in several respects: (1) the purchase of D.O.'s amounts to the payment of kickbacks in exchange for the referral of Medicare patients, in violation of federal anti-kickback statutes, and (2) the braces and other DME supplied by the DME companies are largely medically unnecessary, and often unwanted and unused, amounting to health care fraud on Medicare and other insurers.

25.     The GREENS also used criminal proceeds of their specified unlawful activities to conduct financial transactions in amounts over $10,000 in violation of the money laundering statutes.

26.     The GREENS also used criminal proceeds of their specified unlawful activities to conduct financial transactions to promote their scheme, in violation of the money laundering statutes.

**IV.   FACTS**

27.     <u>Melinda Elizabeth Green</u> (M. GREEN) was a resident of Escondido, California. M. Green was married to Charles Ronald Green.

28.     <u>Charles Ronald Green Jr.</u> (R. GREEN) was a resident of Escondido, California. R. GREEN was married to M. GREEN.

29.     M. GREEN and R. GREEN (the GREENS) owned or controlled several companies, including EZ LIFE, PRV, ZEE and CHOICE, that supplied durable medical equipment (DME) braces to patients that were Medicare beneficiaries.

30.     Between at least June 1, 2018 and February 29, 2020, the GREENS, in order to obtain customers for their DME companies, paid various marketers for providing the

GREENS with customers that are Medicare beneficiaries *along with* signed D.O.'s for medically unnecessary DME. The GREENS then submitted claims to Medicare and other insurers for the DME, thereby paying illegal kickbacks for patients and defrauding Medicare.

**GREENS Purchased "Completed Doctor's Orders" From Person 1**

31. For example, the GREENS purchased D.O.'s From Person 1. The GREENS purchase of D.O.'s is a violation of the federal anti-kickback statute.

32. Person 1 was a part-owner of Company 1. Company 1 sold completed DME D.O.'s to the GREENS in 2018 and 2019. Company 1 obtained D.O.'s by purchasing "leads" which included a patient's name, biographical details, Medicare beneficiary number, and the patient's agreement to buy a brace. Company 1 used telemedicine doctors to obtain signed prescriptions for the DME.

33. These signed prescriptions from telemedicine doctors were often "rubber-stamped." The patient's "agreement" to purchase a brace was often faked. While recordings from telemarketers supposedly showed that the patient had agreed to the treatment, the recordings actually contained "dubbed-in" answers.

34. Medicare was then billed through PRV, EZ LIFE, or one of the other DME companies that was controlled or operated by the GREENS.

**GREENS Paid Person 2 a Per-Brace Fee**

35. Person 2 also worked with the GREENS. Person 2 owned Company 2. The GREENS paid Person 2 approximately $15 per brace for D.O.'s that the GREENS purchased from Company 1.

36. Company 1 provided D.O.'s to the GREENS for no cost up front. After Medicare paid for the claim, the GREENS would then pay Company 1 for the braces that had already been accepted and paid for by Medicare.

37. In cases where Medicare reversed the payment, or the patient rejected or returned the brace, that amount was then subtracted from the GREENS' next payment to

Company 1. The GREENS payment *only* for signed D.O.'s that Medicare made payments on is in violation of the federal anti-kickback statute.

38.    Between October 2018 and February 2019, the GREENS wire-transferred over $1.3 million to Company 1. These payments were predominantly made from the GREENS' DME companies, EZ LIFE and PRV. A small payment was from the GREEN's company, NHS SALES.

39.    Between October 2018 and April 2019, the GREENS wire-transferred over $160,000 to Company 2.

**GREENS Order Large Shipments of DME From Person 3 and Company 3**

40.    Person 3 was co-owner of a DME supply company, Company 3, that manufactured DME braces.

41.    In 2018, Person 3, through Company 3 began doing business with the GREENS.

42.    The GREENS were co-owners of Red Rock Operations, Inc. (RED ROCK). RED ROCK is a company located in Atlanta, Georgia and it acted as a drop shipper for DME braces.

43.    At this time, between approximately 200 and 500 boxes were being shipped from RED ROCK on a daily basis. Each of these boxes included a back brace, two leg braces, and two wrist braces.

44.    In 2018 or early 2019, Red Rock ordered between 2000 and 3000 DME products from Company 3. This was the largest order that Company 3 had ever received. EZ LIFE and PRV (the GREENS' companies) paid for the order.

45.    Company 3 shipped the orders to RED ROCK without seeing any patient information. Company 3 became increasingly busy after the company started to do business with the GREENS.

46.    Between August 2018 and April 2019, the GREENS wire-transferred approximately $4.5 million to Company 3 from bank accounts held by EZ LIFE and PRV.

47.     Between December 2018 and May 2019, Company 3 received at least 10 calls a day from beneficiaries located across the nation who complained about unexpectedly receiving DME items in the mail.

48.     The most common complaint from the beneficiaries was that they had no idea why they had received braces in the mail. The beneficiaries reported that they had not visited the doctors identified as having ordered the equipment for them.

49.     The beneficiaries called Company 3 because that was the company named on the DME items. There were no operational phone numbers listed or available for the DME companies that supposedly sent the equipment. Company 3 began receiving these types of complaint calls after Company 3 started doing business with the GREENS.

**GREENS Used NHS and NHS Sales to Sell D.O.'s and Bill Company 4**

50.     Person 4 and Person 5 were co-owners of a company called Company 4. Company 4 also operated other DME companies.

51.     In late 2018, Person 4, Person 5, and the GREENS agreed to do business. Person 4 and Person 5, and Company 4, agreed to purchase D.O.'s from the GREENS based on a per-brace fee when purchasing D.O.'s. This is another example of the GREENS violating the federal anti-kickback statute. Not only did the GREENS purchase D.O.'s in violation of the federal anti-kickback statute but they also sold them.

52.     The written contract between Company 4 and the GREENS did not specify a per-brace fee. Instead, the contract stated that NHS SALES would do "marketing" for Company 4.

53.     The GREENS also handled the billing for Company 4.

54.     In early 2019, the GREENS sold DME D.O.'s to Company 4 and billed Medicare on behalf of Company 4 and Company 4's other DME companies.

55.     The GREENS sent invoices to Company 4 in 2019 that did not reflect what Company 4 was actually paying the GREENS for. The invoices instead hid and obscured the fraudulent services. For example, invoices claimed that Company 4 was paying for TV advertisements, landing pages, and business processing services, when Company 4 did not

receive those services from the GREENS. The deceptive billing done by the GREENS was to further their Medicare fraud scheme and hide their violations of the federal anti-kickback statute.

**Medicare Beneficiaries Receive Medically Unnecessary DME From GREENS**

56.     Medicare beneficiaries received medically unnecessary DME from the GREENS' companies.

57.     For example, <u>Medicare beneficiary M.G.</u> resided in an assisted living facility as of June 2018.  In early November 2018, a package was delivered to M.G.'s former residence. The package contained a back brace and some papers. The package came from Company 17, which was a DME company operated by Company 4.

58.     Approximately one week later, another package was delivered to M.G.'s previous residence. This package contained a shoulder brace, back brace, and a patient satisfaction survey. The return label read "PRV Medical Supply, Inc," which was the GREENS' DME company.

59.     M.G. never ordered these braces. M.G. was almost totally deaf and did not answer the telephone in 2018.  M.G's daughter, L.G., called PRV and obtained a copy of the prescription written for M.G. The prescription reflected a doctor as the prescriber that was *not* M.G.'s doctor.  In addition, the exam notes did not reflect M.G.'s medical history of a herniated disc, or a broken arm, and incorrectly listed M.G.'s height and weight.

60.     Medicare claims data shows that PRV submitted a claim to Medicare in 2018, on behalf of M.G., for a back brace and a right-side shoulder-elbow-wrist-hand orthosis. The total amount PRV billed to Medicare was $2,005.08, and the total amount Medicare paid to PRV was $512.14. Medicare denied payment to PRV for the back brace because it was deemed medically unnecessary.

61.     In another example, in January 2019 <u>Medicare beneficiary D.B.</u> answered some questions online supposedly to win a $1,000 Amazon gift card. The questions were related to pain. D.B. provided her name, address, date of birth, phone number, and primary doctor's name.

62.     A few days later, D.B. received a phone call from an unknown individual asking about D.B.'s pain. The individual stated that a back brace could help with D.B.'s pain. The caller also offered a cane. The call was then transferred to another individual D.B. likened to be a doctor. This individual also thought a back brace would be helpful and told D.B. the back brace was covered by Medicare.

63.     One week later, D.B. received a box from EZ LIFE. The box contained a back brace, right knee brace, left knee brace, two suspension sleeves, and a nylon drawstring backpack. D.B. called the company and told them D.B. did not want the braces. D.B. noted that no one mentioned knee braces during the calls with the individuals.

64.     Medicare claims data shows that EZ LIFE submitted a claim to Medicare in 2019, on behalf of D.B. for a back brace, left and right knee braces, as well as left and right suspension sleeves. The total amount EZ LIFE billed to Medicare was $3,703.10, and the total amount paid by Medicare to EZ LIFE was $1,555.80. Medicare denied payment on the back brace as it was deemed medically unnecessary.

**Nationwide Takedown Targeting Illegal Kickbacks and Medicare Fraud**

65.     On April 9, 2019, a wave of search warrants, indictments, and arrests were carried out in connection with Operation Brace Yourself, a nationwide initiative targeting kickbacks paid for DME products billed to Medicare.

66.     In letters dated April 9, 2019, EZ LIFE and PRV were notified that the companies were placed on suspension and that EZ LIFE and PRV would not be paid for claims submitted to Medicare for payment.

67.     The GREENS continued to request payment on outstanding invoices for providing D.O.'s after the April 2019 nationwide criminal takedown.

68.     Within the weeks after the April 9, 2019 nationwide criminal takedown, the GREENS added David P. Tenney (TENNEY) as Chief Financial Officer (CFO) to several of their companies. For example, TENNEY became listed as the CFO and Secretary of NHS SALES on May 7, 2019, and then EZ LIFE on June 11, 2019, and later PRV on July 23, 2019.

69. David P. Tenney was the Trustee of the Greenshaven Trust.

70. On May 6, 2019, approximately $12 million in treasury bills were transferred to Fidelity Investments account number x0472, held by the Greenshaven Trust, with David P. Tenney as the Trustee.

**GREENS' DME Bank Accounts Received Criminal Proceeds & Laundered Funds EZ LIFE**

71. The GREENS used their DME company <u>E.Z. LIFE MEDICAL SUPPLY, Inc. (EZ LIFE)</u> to pay illegal kickbacks and fraudulently bill Medicare.

72. R. GREEN was the CEO and director of EZ LIFE. EZ LIFE was incorporated under the laws of the state of California. EZ LIFE had a business address in Escondido, California.

73. Between June 1, 2018 and April 9, 2019, EZ LIFE billed Medicare $84,323,467.09 for DME claims, which resulted in Medicare making payments of $47,717,790.16 to EZ LIFE.

74. The $47,717,790.16 Medicare paid to EZ LIFE constitutes criminal proceeds obtained as a result of the illegal kickback and health care fraud scheme.

75. The $47,717,790.16 in criminal proceeds also constitute criminal proceeds derived from the illegal kickback and health care fraud scheme, which are specified unlawful activities.

76. Between June 1, 2018 and February 29, 2020, the GREENS, through EZ LIFE, knowingly conducted financial transactions in amounts over $10,000 with some of the $47,717,790.16 in criminal proceeds obtained from the illegal kickback and health care fraud scheme.

77. Between June 1, 2018 and February 29, 2020, the GREENS, through EZ LIFE, knowingly conducted financial transactions to promote the kickback and health care fraud scheme with some of the $47,717,790.16 in criminal proceeds obtained from the illegal kickback and health care fraud scheme.

78. The GREENS received Medicare deposits and conducted financial transactions from the following bank accounts held by EZ LIFE.

**EZ Life Bank Account: SB x0595**

79. Silvergate Bank account number x0595 (SB x0595) was held in the name of EZ Life Medical Supply INC and Pharma Funding LLC. The signers on the account were R. GREEN (registered as Charles Ronald Green) and M. GREEN (registered as Melinda Elizabeth Green). The account was opened on June 26, 2018. On August 2, 2018 SB x0595 began to receive deposits from Medicare.

80. Between August 2, 2018 and April 8, 2019, approximately $41,926,874.75 was deposited into SB x0595 from Medicare, of which $40,772,000.75 was subsequently transferred to WF x1430.[1]

**EZ Life Bank Account: JPMC x3080**

81. JPMorgan Chase Bank account number x3080 (JPMC x3080) was held in the name of EZ Life Medical Supply, Inc. The signers on the account were R. GREEN (registered as Ronald Green) and M. GREEN (registered as Melinda Green).

82. Between July 6, 2018 and August 6, 2018, approximately $1,048,925.72 was deposited into JPMC x3080 from Medicare, of which $1,032,658.80 was subsequently transferred to WF x1430.[2]

**EZ LIFE Bank Account: WF x1430**

83. Wells Fargo Bank account number x1430 (WF x1430) was held in the name of E.Z Life Medical Supply, INC. The signer on the account was R. GREEN (registered as Charles Ronald Green Jr). The account was opened on June 20, 2018.

84. Between August 3, 2018 and April 12, 2019, $40,772,000.75 was wire-transferred from SB x0595 to WF x1430. Each of these wire transfers was for an amount over $10,000.

---

[1] SB 0595 was closed in August 2019 and did not have significant funding other than deposits from Medicare.

[2] JPMC x3080 was closed on 10/30/2018 and did not have significant funding other than deposits from Medicare.

15

85.     Between August 3, 2018 and April 12, 2019 WF x1430 received:

    a.   $1,222,462.59 in checks deposited from Medicare.

    b.   $3,453,368.94 in checks deposited from private insurance companies.

    c.   $1,032,658.80 from JPMC x3080.

    d.   $339,275.00 from WF x3071.

    e.   $381,250.00 from WF x0557.

    f.   $443,000.00 from WF x0706.

86.     The criminal proceeds deposited into WF x1430 were transferred to the following companies in order to promote the fraud:

    a.   $19,869,382.43 was wired to Company 6.

    b.   $3,260,971.24 was wired to Company 3.

    c.   $1,611,880.08 was wired to RED ROCK.

    d.   $1,175,885.58 was wired to Square One.

    e.   $13,440.00 was wired to Company 2.

    f.   $172,575.00 was wired to Company 1.

**PRV**

87.     The GREENS used their DME company PRV Medical Supply, Inc. (PRV) to pay illegal kickbacks and fraudulently bill Medicare.

88.     M. GREEN was the Chief Executive Officer (CEO) of PRV. PRV was incorporated under the laws of the state of California. PRV has a business location in Escondido, California.

89.     Between September 4, 2018 and April 4, 2019, PRV billed Medicare $40,560,360.43 for DME claims, which resulted in Medicare making payments of $21,147,325.85 to PRV.

90.     The $21,147,325.85 Medicare paid to PRV constitutes criminal proceeds obtained as a result of the illegal kickback and health care fraud scheme.

91.     The $21,147,325.85 also constitute criminal proceeds derived from the illegal kickback and health care fraud scheme, which are specified unlawful activities.

92.    Between September 4, 2018 and February 29, 2020, the GREENS, through PRV, knowingly conducted financial transactions in amounts over $10,000 with some of the $21,147,325.85 in criminal proceeds obtained from the illegal kickback and health care fraud scheme.

93.    Between September 4, 2018 and February 29, 2020, the GREENS, through PRV, knowingly conducted financial transactions to promote the kickback and health care fraud scheme with some of the $21,147,325.85 in criminal proceeds obtained from the illegal kickback and health care fraud scheme.

94.    The GREENS received Medicare deposits and conducted financial transactions from the following bank accounts held by PRV.

**PRV Bank Account: BOA x6473**

95.    Bank of America account number x6473 (BOA x6473) was held in the name of PRV Medical Supply, Inc. The signers on the account were R. GREEN (registered as Charles Ronald Green JR) and M. GREEN (registered as Melinda Elizabeth Green).

96.    Between September 26, 2018 and April 8, 2019, approximately $1,591,220.69 was deposited into BOA x6473 from Medicare, of which $1,588,500 was subsequently transferred to WF x3071.[3]

**PRV Bank Account: WF x3071**

97.    Wells Fargo Bank account number x3071 (WF x3071) was held in the name of PRV Medical Supply, INC. The signers on the account were R. GREEN (registered as Charles Ronald Green JR) and M. GREN (registered as Melinda E. Green).  WF x3071 was opened on September 11, 2018 and was predominantly funded by deposits from Medicare.

98.    Between November 1, 2018 and February 28, 2020 WF x3071 received:

     a.    $16,978,289.38 from Medicare.

     b.    $2,169,424.30 from private insurance.

     c.    $1,588,500.00 from BOA x6473.

---

[3]    BOA x6473 was closed on 05/29/2019 and did not have significant funding other than deposits from Medicare.

d.     $40,000.00 from WF x1430.

e.     Approximately $125,000.00 was deposited into WF x3071 from WF x0706.

99.   The proceeds deposited into WF x3071 were transferred to the following companies in order to promote the fraud:

a.     $6,614,715.00 was wired to Company 6.

b.     $730,355.35 was wired to RED ROCK.

c.     $457,622.00 was wired to Company 7.

d.     $1,143,960.00 was wired to Company 1.

e.     $82,790.36 was wired to Company 2.

**ZEE**

100.   The GREENS used their DME company <u>ZEE & Associates, Inc. (ZEE)</u> to pay illegal kickbacks and fraudulently bill Medicare.

101.   R. GREEN was the agent for process of ZEE. ZEE was incorporated under the laws of the state of California, and had a business location in Escondido, California.

102.   For example, between June 15, 2019 and June 4, 2020, ZEE billed Medicare $1,553,720.26 for DME claims, which resulted in Medicare making payments of $778,733.66 to ZEE.

103.   The $778,733.66 Medicare paid to ZEE constitutes criminal proceeds obtained as a result of the illegal kickback and health care fraud scheme.

104.   The $778,733.66 also constitute criminal proceeds derived from the illegal kickback and health care fraud scheme, which are specified unlawful activities.

105.   Between June 15, 2019 and February 29, 2020, the GREENS, through ZEE, knowingly conducted financial transactions in amounts over $10,000 with some of the $778,733.66 in criminal proceeds obtained from the illegal kickback and health care fraud scheme.

106.   The GREENS received Medicare deposits and conducted financial transactions from the following bank accounts held by ZEE.

18

**ZEE Bank Account: BOA x5609**

107.   Bank of America account number x5609 (BOA x5609) was held in the name Zee & Associates LLC, DBA Bio Scientific Medical Supply. The signer on the account was R. GREEN (registered as Charles Ronald Green).

108.   Between July 11, 2019 and February 29, 2020, the account received $871,723.38 from Medicare.

**ZEE Bank Account: WF x9816**

109.   Wells Fargo Bank account number x9816 (WF x9816) was held in the name Zee & Associates, LLC. The signer on the account was R. GREEN (registered as Charles R. Green JR).  The account was opened on September 19, 2019.

110.   Between September 19, 2019 and February 29, 2020, the account received:

a.   $257,100.00 from BOA x5609.

b.   $267,000.00 from WF x0706.

c.   $41,422.37 from private insurance deposits.

**CHOICE**

111.   The GREENS used their DME company CHOICE Medical Products, Inc. (CHOICE) to pay illegal kickbacks and fraudulently bill Medicare.

112.   R. GREEN was the president of CHOICE. CHOICE was incorporated under the laws of the state of Florida. CHOICE had a business address in Escondido, California.

113.   For example, between October 21, 2019 and April 5, 2020, CHOICE billed Medicare $500,343,70 for DME claims, which resulted in Medicare making payments of $276,273.18 to CHOICE.

114.   The $276,273.18 Medicare paid to CHOICE constitute criminal proceeds obtained as a result of the illegal kickback and health care fraud scheme.

115.   The $276,273.18 also constitute criminal proceeds derived from the illegal kickback and health care fraud scheme, which are specified unlawful activities.

116.   Between October 21, 2019 and February 29, 2020, the GREENS, through CHOICE, knowingly conducted financial transactions in amounts over $10,000 with some of the $276,273.18 in criminal proceeds obtained from the illegal kickback and health care fraud scheme.

117.   Between October 21, 2019 and February 29, 2020, the GREENS, through CHOICE, knowingly conducted financial transactions to promote the kickback and health care fraud scheme with some of the $276,273.18 in criminal proceeds obtained from the illegal kickback and health care fraud scheme.

118.   The GREENS received Medicare deposits and conducted financial transactions from the following bank accounts held by CHOICE.

**CHOICE Bank Account: BOA x0729**

119.   Bank of America account number x0729 (BOA x0729) was held in the name Choice Medical Products Inc. The signers on the account were William J. Iacovone (President) and R. GREEN (registered as Charles Ronald Green (Secretary)).

120.   Between July 11, 2019 and February 29, 2020, the account received $159,0171.62 in deposits from Medicare, of which $141,794.82 was transferred to WF x6408.

**CHOICE Bank Account: WF x6408**

121.   Wells Fargo bank account number x6408 (WF x6408) was held in the name Choice Medical Products, Inc. The signer on the account was R. GREEN (registered as Charles R Green JR).  WF x6408 was opened on October 4, 2019.

122.   Between October 4, 2019 and February 29, 2020, the account received:

   a.   $174,788.95 from Medicare.

   b.   $10,717.77 from private insurance companies.

   c.   $141,794.82 from BOA x0729.

   d.   $15,500.00 from WF x0706.

**NHS**

123.   The GREENS' used their pharmacy billing company, <u>NHS PHARMA, Inc.</u> <u>(NHS)</u>, to receive criminal proceeds through NHS' bank accounts from their DMS companies, EZ LIFE, PRV, ZEE, and CHOICE.

124.   M. GREEN and R. GREEN were each CEOs. R. GREEN was the Director. NHS was incorporated under the laws of the state of California. NHS had a business address in Escondido, California.

125.   Between June 20, 2018 and February 29, 2020, the GREENS, through NHS, received criminal proceeds obtained as a result of the illegal kickback and health care fraud scheme.

126.   The criminal proceeds obtained also constitute criminal proceeds derived from the illegal kickback and health care fraud scheme, which are specified unlawful activities.

127.   Between June 20, 2018 and February 29, 2020, the GREENS, through NHS, knowingly conducted financial transactions in amounts over $10,000 with some of the criminal proceeds obtained from the illegal kickback and health care fraud scheme.

128.   Between June 25, 2018 and February 29, 2020, the GREENS, through NHS, knowingly conducted financial transactions to promote the kickback and health care fraud scheme with some of the criminal proceeds obtained from the illegal kickback and health care fraud scheme.

129.   The GREENS received criminal proceeds and conducted financial transactions from the following bank account held by NHS.

**<u>NHS Bank Account: WF x0706</u>**

130.   Wells Fargo Bank account number x0706 (WF x0706) was held in the name of NHS Pharma, Inc. The signers on the account were R. GREEN (registered as Charles Ronald Green JR) and M. GREEN (registered as Melinda E Green). This account was opened on April 9, 2015. Throughout the lifecycle of the account it received deposits from several pharmaceutical companies.

131. Between June 20, 2018 and December 10, 2019, WF x0706 received transfers of:

    a.    $17,720,796.01 from WF x1430.

    b.    $8,500,000.00 from WF x3071.

    c.    $425,897.61 from WF x0557.

132. Most of these transfers were in amounts over $10,000.00

133. Criminal proceeds deposited into WF x0706 were utilized to promote the fraud:

    a.    On June 25, 2019, $4,000,000.00 was wired into WF x0706 from WF x3071.

    b.    On June 25, 2019, $1,000,000.00 was wired into WF x0706 from WF x1430.

134. Those transactions funded an outgoing wire of $3,468,057.35 for the purchase of Company 3.

**NHS SALES**

135. The GREENS used their company <u>NHS PHARMA SALES, Inc. (NHS SALES)</u> to receive criminal proceeds and to pay and receive illegal kickbacks as part of their health care fraud scheme.

136. R. GREEN was the CEO. M. GREEN was the Director. NHS SALES was incorporated under the laws of the state of California. NHS SALES had a business address in Escondido, California.

137. Between June 1, 2018 and February 29, 2020, the GREENS, through NHS, SALES received criminal proceeds obtained as a result of the illegal kickback and health care fraud scheme.

138. The criminal proceeds obtained also constitute criminal proceeds derived from the illegal kickback and health care fraud scheme, which are specified unlawful activities.

139.   Between June 1, 2018 and February 29, 2020, the GREENS, through NHS SALES, knowingly conducted financial transactions in amounts over $10,000 with some of the criminal proceeds obtained from the illegal kickback and health care fraud scheme.

140.   Between January 19, 2018 and November 9, 2018, the GREENS, through NHS SALES, knowingly conducted financial transactions to promote the kickback and health care fraud scheme with some of the criminal proceeds obtained from the illegal kickback and health care fraud scheme.

141.   The GREENS received Medicare deposits and conducted financial transactions from the following bank accounts held by NHS SALES.

**NHS SALES Bank Account: WF x0557**

142.   Wells Fargo Bank account number x0557 (WF x0557) was held in the name of NHS Pharma Sales, Inc. The signers on the account were R. GREEN (registered as Charles Ronald Green) and M. GREEN (registered as Melinda E. Green).  This account was opened on April 9, 2015. Prior to receiving funds related to DME fraud, the WF x0557 account received deposits from several pharmaceutical companies.

143.   Between June 1, 2018 and February 29, 2020, WF x0557 received:

      a.   $944,109.93 from WF x1430.

      b.   $5,524,251.37 from WF x0706.

      c.   $366,205.00 from WF x3071.

      d.   Many of these transfers were in amounts over $10,000.

144.   WF x0557 also received the following amounts from DME Companies controlled by Person 5 and Person 4 through Company 4, as well as Company 7:

      a.   $7,610.00 from Company 8.

      b.   $148,295.00 from Company 9.

      c.   $2,740.00 from Company 10.

      d.   $639,307.50 from Company 11.

      e.   $4,555,319.68 from Company 7.

      f.   $467,640.00 from Company 12.

g.      $235.00 from Company 14

145.   Criminal proceeds deposited into WF x0557 were utilized to promote the fraud. Between January 19, 2018 and November 9, 2018, approximately:

a.      $3,244,187.48 was wired to Company 6.

b.      $78,888.09 was wired to Company 5.

c.      $64,559.62 was wired to Company 2.

**ERM**

146.   The GREENS used their company ERM Management Services, Inc. (ERM) to receive criminal proceeds.

147.   R. GREEN was the CEO. ERM was incorporated under the laws of the state of Florida.

148.   Between August 16, 2019 and February 29, 2020, the GREENS, through ERM, received criminal proceeds obtained as a result of the illegal kickback and health care fraud scheme.

149.   The criminal proceeds obtained constitute criminal proceeds derived from the illegal kickback and health care fraud scheme, which are specified unlawful activities.

150.   Between August 16, 2019 and February 29, 2020, the GREENS, through ERM, knowingly conducted financial transactions in amounts over $10,000 with some of the criminal proceeds obtained from the illegal kickback and health care fraud scheme.

151.   The GREENS received criminal proceeds and conducted financial transactions from the following bank account held by ERM.

**ERM Bank Account: WF x7253**

152.   Wells Fargo Bank account number x7253 (WF x7253) was held in the name of ERM Management Services, Inc. The signers on the account were R. GREEN (registered as Charles Ronald Green Jr) and TENNEY (registered as David Palmer Tenney).   The account was opened on August 16, 2019.

153.   Between August 16, 2019 and February 29, 2020, the account received:

1

    a.    $,1,625,790.22 from WF x0706.

2

    b.    $162,812.73 from WF x6408.

3

    c.    $125,522.89 from WF x9816.

4

**FOCUS**

5

154.   The GREENS used their DME billing company FOCUS DME Billing

6

(FOCUS) to receive criminal proceeds.

7

155.   M. GREEN was a Director/Officer. R. GREEN was the CEO and a Director.

8

FOCUS was incorporated under the laws of the state of Florida. FOCUS had a business

9

address in Escondido, California.

10

156.   Between January 16, 2019 and February 29, 2020, the GREENS, through

11

ERM, received criminal proceeds obtained as a result of the illegal kickback and health care

12

fraud scheme.

13

157.   The criminal proceeds derived from the illegal kickback and health care fraud

14

scheme, which are specified unlawful activities.

15

158.   Between January 16, 2019 and February 29, 2020, the GREENS, through

16

FOCUS, knowingly conducted financial transactions in amounts over $10,000 with some

17

of the criminal proceeds obtained from the illegal kickback and health care fraud scheme.

18

159.   The GREENS received criminal proceeds and conducted financial transactions

19

from the following bank account held by FOCUS.

20

**FOCUS Bank Account: WF x8049**

21

160.   Wells Fargo Bank account number x8049 (WF x8049) was held in the name

22

of Focus DME Billing Inc. The signers on the account were R. GREEN (registered as

23

Charles Ronald Green Jr) and M. GREEN (registered as Melinda E Green).

24

161.   Between January 16, 2019 and February 29, 2020, the account received funds

25

from the following DME companies owned by Person 4 and Person 5:

26

    a.    $108,723.03 from Company 10.

27

    b.    $265,362.70 from Company 11.

28

    c.    $57,603.45 from Company 13.

       d.     $93,015.09 from Company 12.

       e.     $59,717.00 from Company 14.

       f.     $45,281.43 from Company 15.

       g.     $169,892.25 from Company 16.

162.   Between January 16, 2019 and February 29, 2020, the account also received:

       a.     $500,000.00 from WF x1430.

       b.     $650,000.00 from WF x0557.

**The Fidelity Accounts**

163.   The GREENS used their Fidelity Accounts to receive criminal proceeds.

164.   The signers on Fidelity Investments account number x0819 (F x0819) were R. GREEN (registered as Charles Ronald Green JR) and M. GREEN (registered as Melinda Elizabeth Green).

165.   Between March 15, 2019 and March 18, 2019, the entire balance of this account was used to purchase 12,056,000 shares of United States treasury bills.

166.   <u>F x0819 was funded by transfers in criminal proceeds from WF x0706:</u>

       a.     On March 11, 2019, WF x0706 received $6,822,000.00 from WF x1430, and an additional $4,500,000.00 from WF x3071, for a total of $11,322,000.00.

       b.     On March 12, 2019, $1,000.00 was wired transferred from WF x0706 to F x0819.

       c.     On March 13, 2019, $9,000,000.00 was wire transferred from WF x0706 to F x0819.

       d.     On March 14, 2019, $3,000,000.00 was wire transferred from WF x0706 to F x0819.

167.   <u>Balance of WF x0706 used to purchase treasury bills</u>: Between March 15, 2019 and March 18, 2019, the entire F x0819 account balance was used to purchase 12,056,000 shares of United States treasury bills.

168.   On May 6, 2019, the treasury bills were transferred to Fidelity Investments account number F x0472 (F x0472), held by the Greenshaven Trust with TENNEY (registered as David P. Tenney) as the Trustee.

169.   Between May 6, 2019 and May 31, 2020, the funds were relocated across the 8 brokerage accounts held in the name the Greenshaven Trust that are, collectively, (the Fidelity Accounts):

   a.   Fidelity Investments account number XX0472. The account was registered to the Greenshaven Trust. The signer on the account was David Tenney.

   b.   Fidelity Investments account number XX0473. The account was registered to the Greenshaven Trust. The signer on the account was David Tenney.

   c.   Fidelity Investments account number XX0474. The account was registered to the Greenshaven Trust. The signer on the account was David Tenney.

   d.   Fidelity Investments account number XX0475. The account was registered to the Greenshaven Trust. The signer on the account was David Tenney.

   e.   Fidelity Investments account number XX0476. The account was registered to the Greenshaven Trust. The signer on the account was David Tenney.

   f.   Fidelity Investments account number XX0477. The account was registered to the Greenshaven Trust. The signer on the account was David Tenney.

   g.   Fidelity Investments account number XX4433. The account was registered to the Greenshaven Trust. The signer on the account was David Tenney.

   h.   Fidelity Investments account number XX2582. The account was registered to the Greenshaven Trust. The signer on the account was David Tenney.

170. Various bonds and equities were purchased and sold within The Fidelity Accounts, but all funds and assets held in the accounts originate from and are traceable to the $12,001,000.00 transferred from WF x0706.

**VEHICLES**

**<u>Audi Q8</u>**

171. The Audi Q8 was registered to R. GREEN.

172. On April 2, 2019, a $75,627.71 cashier's check was written from WF x3071 made payable to Audi South Orlando for the purchase of the Audi Q8.

173. As recited in paragraph above under WF x3071:

      a. $16,978,289.38 in criminal proceeds were deposited into WF x3071 from Medicare, and $2,169,424.30 from private insurance.

      b. WF x3071 also received $1,588,500.00 from BOA x6473, $40,000.00 from WF x1430, and $125,000.00 from WF x0706.

174. The Audi Q8 was purchased entirely with criminal proceeds.

**<u>Porsche Panamera</u>**

175. The 2018 Porsche Panamera, California license plate number 8GTX359, vehicle identification number WP0AB2A76JL1355537 was registered to R. GREEN as (Charles R. Green). On December 17, 2018, R. GREEN purchased a 2018 Porsche Panamera from Hoehn Porsche, CA license plate 8GTX359.

176. On December 18, 2018, WF x1430 received $555,215.39 in criminal proceeds from SBx0595. That same day, a $10,000 check written from WF x1430 to Hoehn Porsche was cashed, and on December 19, 2018, an additional $126,013.87 check written to Hoehn Porsche was cashed.

177. The Porsche Panamera was purchased entirely with criminal proceeds.

**<u>Ford F-150</u>**

178. The 2019 Ford Lariat 4X2 F-150, Florida license plate number LEJQ98, vehicle identification number 1FTEW1C51KFB110044 was registered to R. GREEN.

179. On March 30, 2019, a $56,675.37 cashier's check was written from WF x1430 made payable to Greenway Ford, for the purchase of the Ford F-150.

180. The Ford F-150 was purchased entirely with criminal proceeds.

**Real Property**

181.    R. GREEN and M. Green are the owners of real property (Real Property) located at 2936 Midsummer, Drive, Windemere, Florida, 34786. The warranty deed dated March 29, 2019 reflects that the Real Property was purchased by R. GREEN and M. GREEN, has husband and wife.

182.    On March 26, 2019, $3,092,841.00 in criminal proceeds was wired from WF x0706 to Fidelity National Title for the purchase of the Real Property.

183.    The RP was purchased entirely with criminal proceeds.

**V.    CLAIM FOR RELIEF**

**FOFEITURE PROVISIONS**

184.    The Defendant is property that constitutes or is derived from proceeds traceable to the below violations and is therefore, subject to forfeiture to the United States in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 18, United States Code, Section 981(a)(1)(A).

185.    The Defendant constitutes forfeitable proceeds under Title 18, United States Code, Section 981(a)(1)(C), as any property, real or personal, which constitutes or are derived, from proceeds traceable to Defendants' violations of Title 18, United States Code, Section 1349 (Conspiracy to Commit Wire/Mail Fraud and Health Care Fraud); and (Conspiracy to Commit Wire Fraud and Health Care Fraud); and Title 18, United States Code, Section 1347 (Health Care Fraud); and Title 42, United States Code, Section 1320-7b(b)(2)(A) (Anti-Kickback Statute); and Title 18, United States Code, Section 1956 (Laundering Monetary Instruments); and Title 18, United States Code, Section 1957 (Transacting in Criminal Proceeds); or any violation of any offense constituting a "specified unlawful activity" as defined in Title 18, United States Code, Section 1956(c)(7), or a conspiracy to commit such offense.

186.    The Defendant is also subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(A) as any property, real or personal, involved in a transaction or

1  attempted transaction in violation of Title 18, United States Code, Section 1956, or Title 18,
2  United States Code, Section 1957.

3                                        **COUNT 1**

4  **Defendant $49,812.40 in U.S. currency From Wells Fargo Bank account number**
5  **XX3071**

6          187.   The United States incorporates by reference the allegations in paragraphs one
7  (1) through one-eighty-three (183) above as though fully set forth herein.

8          188.   The Defendant $49,812.40 in U.S. currency from Wells Fargo Bank account
9  number XX3071 is forfeitable pursuant to the forfeiture provisions in paragraphs 184
10 through 186 above.

11         189.   Based upon the foregoing the Defendant is subject to forfeiture to the
12 United States pursuant to Title 18, United States Code, Section 981.

13                                       **COUNT 2**

14 **Defendant $1,016,738.02 in U.S. currency From Wells Fargo Bank account number**
15 **XX1430**

16         190.   The United States incorporates by reference the allegations in paragraphs one
17 (1) through one-eighty-three (183) above as though fully set forth herein.

18         191.   The Defendant $1,016,738.02 in U.S. currency From Wells Fargo Bank
19 account number XX1430 is forfeitable pursuant to the forfeiture provisions in paragraphs
20 184 through 186 above.

21         192.   Based upon the foregoing the Defendant is subject to forfeiture to the
22 United States pursuant to Title 18, United States Code, Section 981.

23                                       **COUNT 3**

24 **Defendant $15,448.64 in U.S. currency From Wells Fargo Bank account number**
25 **XX0706**

26         193.   The United States incorporates by reference the allegations in paragraphs one
27 (1) through one-eighty-three (183) above as though fully set forth herein.

28

194. The Defendant $15,448.64 in U.S. currency From Wells Fargo Bank account number XX0706 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

195. Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

**COUNT 4**

**Defendant $559.15 in U.S. currency seized From Wells Fargo Bank account number XX0557**

196. The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

197. The Defendant $559.15 in U.S. currency seized From Wells Fargo Bank account number XX0557 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

198. Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

**COUNT 5**

**Defendant $142,580.46 in U.S. currency From Wells Fargo Bank account number XX9816**

199. The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

200. The Defendant $142,580.46 in U.S. currency From Wells Fargo Bank account number XX9816 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

201. Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

**COUNT 6**

**Defendant $60,961.48 in U.S. currency From Wells Fargo Bank account number XX6408**

202.   The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

203.   The Defendant $60,961.48 in U.S. currency From Wells Fargo Bank account number XX6408 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

204.   Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

## COUNT 7

**Defendant $2,058,060.72 in U.S. currency From Wells Fargo Bank account number XX7253**

205.   The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

206.   The Defendant $2,058,060.72 in U.S. currency From Wells Fargo Bank account number XX7253 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

207.   Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

## COUNT 8

**Defendant $1,022.12 in U.S. currency From Wells Fargo Bank account number XX8049**

208.   The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

209.   The Defendant $1,022.12 in U.S. currency From Wells Fargo Bank account number XX8049 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

210.   Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

**COUNT 9**

**Defendant $4,983.50 in U.S. currency From Wells Fargo Bank account number XX8506**

211.   The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

212.   The Defendant $4,983.50 in U.S. currency From Wells Fargo Bank account number XX8506 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

213.   Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

**COUNT 10**

**Defendant $4,388,112.64 in U.S. currency From Fidelity Investments account number XX0472**

214.   The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

215.   The Defendant $4,388,112.64 in U.S. currency From Fidelity Investments account number XX0472 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

216.   Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

**COUNT 11**

**Defendant $2,134,352.70 in U.S. currency From Fidelity Investments account number XX0473**

217.   The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

218.   The Defendant $2,134,352.70 in U.S. currency From Fidelity Investments account number XX0473 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

219.   Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

## COUNT 12

**Defendant $3,896,247.90 in U.S. currency From Fidelity Investments account number XX0474**

220.   The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

221.   The Defendant $3,896,247.90 in U.S. currency From Fidelity Investments account number XX0474 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

222.   Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

## COUNT 13

**Defendant $544,162.17 in U.S. currency From Fidelity Investments account number XX0475**

223.   The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

224.   The Defendant $544,162.17 in U.S. currency From Fidelity Investments account number XX0475 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

225.   Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

## COUNT 14

**Defendant $837,395.44 in U.S. currency From Fidelity Investments account number XX0476**

226.   The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

227.   The Defendant $837,395.44 in U.S. currency From Fidelity Investments account number XX0476 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

228.   Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

**COUNT 15**

**Defendant $218,544.33 in U.S. currency From Fidelity Investments account number XX0477**

229.   The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

230.   The Defendant $218,544.33 in U.S. currency From Fidelity Investments account number XX0477 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

231.   Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

**COUNT 16**

**Defendant $292,635.83 in U.S. currency From Fidelity Investments account number XX4433**

232.   The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

233.   The Defendant $292,635.83 in U.S. currency From Fidelity Investments account number XX4433is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

234.   Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

**COUNT 17**

**Defendant $950.20 in U.S. currency seized from Fidelity Investments account number XX2582**

235.   The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

236.   The Defendant $950.20 in U.S. currency seized from Fidelity Investments account number XX2582 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

237.   Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

## COUNT 18

**Defendant 2018 Porsche Panamera, California license plate number 8GTX359, vehicle identification number WP0AB2A76JL1355537**

238.   The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

239.   The Defendant 2018 Porsche Panamera, California license plate number 8GTX359, vehicle identification number WP0AB2A76JL1355537 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

240.   Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

## COUNT 19

**Defendant 2019 Ford Lariat 4X2 F-150, Florida license plate number LEJQ98, vehicle identification number 1FTEW1C51KFB110044**

241.   The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

242.   The Defendant 2019 Ford Lariat 4X2 F-150, Florida license plate number LEJQ98, vehicle identification number 1FTEW1C51KFB110044 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

243.   Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

**COUNT 20**

**Defendant 2019 Audi Q8 Premium, Florida license plate number LCII94, vehicle identification number WA1AVAF10KD010335**

244. The United States incorporates by reference the allegations in paragraphs one (1) through one-eighty-three (183) above as though fully set forth herein.

245. The Defendant 2019 Audi Q8 Premium, Florida license plate number LCII94, vehicle identification number WA1AVAF10KD010335 is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

246. Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

**COUNT 21**

**Defendant Real Property Located at 2936 Midsummer Dr, Windermere, Fl 34786**

247. The United States incorporates by reference the allegations in paragraphs one (1) through ninety-eight-three (183) above as though fully set forth herein.

248. The Defendant Real Property is located at 2936 Midsummer Dr, Windermere, Fl 34786, more particularly described as:

Lot 4, LAKE DOWN SHORES REPLAT, according to the plat thereof as recorded in Plat Book 4, Page 31, Public Records of Orange County, Florida; together with an undivided one forty-fourth (1/44) interest in and to Lot 23, Block A, less the West 95 feet thereof, Lake Down Shores, according to the plat thereof as recorded in Plat Book T, Page 145, Public Records of Orange County, Florida.

Parcel Identification Number: **04-23-28-4406-00040**

**Subject to** all reservations, covenants, conditions, restrictions and easements of record and to all applicable zoning ordinances and/or restrictions imposed by governmental authorities, if any.

**Together** with all the tenements, hereditaments and appurtenances thereto belonging or in any way appertaining.

249. The Defendant Real Property is forfeitable pursuant to the forfeiture provisions in paragraphs 184 through 186 above.

250. Based upon the foregoing the Defendant is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981.

251. The Defendant Real Property is owned by Charles Ronald Green, Jr. and Melinda E. Green, husband and wife. The Defendant Real Property has not been seized. The United States does not request authority from the Court to seize the Defendant Real Property at this time. The United States will, as provided by Title 18, United States code, Section 985(b)(1) and (c)(1), and Supplemental Rule G(4):

    a.    post notice of this action and a copy of the Complaint on the Defendant Real property; and

    b.    serve notice of this action on the Defendant Real Property owner(s), and any other person or entity who may claim an interest in the Defendant Real Property, along with a copy of this Complaint; and

    c.    file a *lis pendens* in county records of the Defendant Real Property's status as a Defendant in this *in rem* action; and

    d.    publish notice of action as required by statute and applicable rules.

**WHEREFORE**, the United States prays that due process issue to enforce the forfeiture of the Defendants and that due notice be given to all interested parties to appear and show cause why said forfeiture should not be declared, that the Defendants be condemned as forfeited to the United States to be disposed of according to law, and for such other relief as this Court may deem just and proper.

DATED:    January 15, 2021    Respectfully submitted,

ROBERT S. BREWER, JR.
United States Attorney

*s/David J. Rawls*
DAVID J. RAWLS
Assistant United States Attorney
Attorneys for the United States

38